FILED
6/2/22 3:31 pm
CLERK
U.S. BANKRUPTCY
COURT - WDPA

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IN RE:

LEO DRELL WOLFE and          :    Case No. 20-22326-TPA
JAMIE LYNN WOLFE,           :
       *Debtors*              :    Chapter 7
                                   :
    JESSE BLAKE and           :    Adv. No. 20-2196-TPA
    JESSICA POUTOUS,         :
       *Plaintiffs*           :
                                     :
       v.                      :    Related to Doc. No. 30
                                     :
    LEO DRELL WOLFE,          :
       *Defendant*          :

*Appearances:*   Brian Farrington, Esq., for the Plaintiff
               Jason R. Johns, Esq., for the Defendant

## **MEMORANDUM OPINION**

       This extensively litigated matter was tried on March 15, 2022.  The Adversary Complaint was filed on December 4, 2020, and originally included five different counts seeking a denial of discharge to Defendant/Debtor Leo Drell Wolfe arising out of a real estate renovation contract that he entered into with the Plaintiffs in January 2018.  Through various preliminary motions filed by the Defendant the dispute was whittled down to two Counts for trial:  Count I for an exception to discharge under *11 U.S.C. §523(a)(2)(A)* based on false pretenses, false representation or actual fraud; and, Count III under *Section 523(a)(6)* for willful and malicious injury. Having now heard the evidence and considered the arguments of the Parties, and for reasons

to be explained below,  the Court finds in favor of Plaintiffs as to Count I and in favor of Defendant

as to Count III.[1]

## *FACTUAL BACKGROUND* [2]

At the start of relevant time period herein (early 2018) the Defendant operated a

business as a sole proprietor under the name of Wolfe's Painting & Handyman Services. The

business had been in existence for about three years.  As indicated by its name, the business did

painting and small renovation/repair jobs. The Defendant did little of the actual work himself, with

most being done through hired  independent contractors.  He had never done a large basement

renovation through the business.  Fourteen years earlier, in 2004, he had been involved as a laborer

just learning masonry on a basement renovation project and was also involved in an unspecified

capacity in one other basement renovation in 1999.

The Plaintiffs are the owners of residential real property commonly known as 939

Ekastown Rd., Saxonburg, Pennsylvania ("the Property).  They have resided at the Property since

---

[1]

The Court has jurisdiction in this matter pursuant to *28 U.S.C. §1334.*  This is a core matter
under *28 U.S.C. §157(a)(2)(I)* and/or *(J)*.

[2]

The factual background as the Court finds herein is based solely on the testimony and exhibits
that were presented and admitted at trial and the *Stipulations of Fact* submitted by the Parties at Doc.
No. 74.  The Court feels compelled to make this statement because both sides in their post-trial briefs
improperly  refer to pretrial discovery deposition testimony and other unadmitted exhibits in support
of factual allegations that they make.  *See generally*, Doc. Nos. 83, 88.  Post trial the Parties were also
given an opportunity to verify the universe of admitted exhibits.  *See* Doc. 81.  Neither party opined
that deposition transcripts were to be part of that universe.  Such material is therefore not part of the
record in the case and will not now be considered by the Court.  *See e.g., Guest v. Bailes*, 448 F.2d
433, 436 at note 2 (6th Cir. 1971) (pretrial discovery depositions not offered into evidence at trial were
not part of the record).

purchasing it about 7 years ago.  The ranch-style house on the Property did not include a basement when Plaintiffs purchased it, but rather only contained a 3 foot high cemented crawlspace.  Plaintiffs were not aware of any issues with the crawlspace when they first moved in but later on at some point they became aware of a problem with water leaking into it, not just around the edges, but all the way to the center.  Believing the problem to be beyond their capabilities to address, the Plaintiffs put out an "RFP" on the internet seeking someone to remediate the problem and waterproof the crawlspace.  Plaintiffs received some responses from basement waterproofing specialists, as well as a response from the Defendant.

The basement waterproofing specialists proposed breaking up the concrete floor in the crawlspace, digging down about a foot, and installing drainage and other waterproofing measures.  The Defendant, after visiting the Property and inspecting it, proposed to convert the existing crawlspace into a full basement to provide for more useable space in the house, as well as to take various measures to address the water infiltration problem.  The Defendant's far more extensive proposal was set forth in a January 22, 2018 email that he sent to Plaintiff Jessica Poutous which listed the following scope of work to be done:

- Basement renovation, Lower basement 6 ft, total height between 8 ft - 9 ft
- Rebuild foundation and walls
- Seal foundation (water proof)
- Install French drains on outside of house
- Rerun downspouts
- Backfill outside of house with B2 gravel
- Replace deck by hot tub
- Bring in topsoil to re-landscape yard
- Install new furnace
- Pour new cement floor in basement

3

*See* Plaintiffs' Exhibit A.  The proposed total cost was $90,000, payable in four payments of $22,500 each, with the first payment due on January 24, 2018, the second due on February 8, 2018, the third due on February 22, 2018, and the final due "upon completion."[3]  Plaintiffs were excited about the possibility of having a basement in the house and they agreed to these terms, thus forming a  contract with the Defendant.[4]

Plaintiffs made the initial payment of $22,500 as required and it appears that Defendant started on the project on or about January 24, 2018.  The Defendant had a number of different individuals who worked on the project during the time it lasted and acknowledged having difficulty in keeping people on the job.  For example, the person he had originally planned on using for masonry work was sent to jail, thus becoming unavailable and never working on the project.  Plaintiff Jessica Poutous testified that she was usually at home while work was being done and that typically on days when work was done, 1 or 2 men would arrive no earlier than 10:00 A.M. and leave by 3:00 P.M.  Defendant himself was not present at the Property very often, perhaps once per week.

---

[3]

The email from Defendant actually stated a total cost of $95,000, but with a provision that $5,000 would be donated by the Defendant to an animal shelter that the Plaintiffs operate on the Property, so the net result was a total cost of $90,000 as indicated.

[4]

The January 22nd email is the only written evidence of the Parties' contract.  In a text message that Plaintiff Jessica Poutous sent to the Defendant on January 24, 2018, and clearly referring to the January 22nd email, she indicated that she had received an email with an outline of services and a payment schedule, but "no contract."  The Defendant responded by stating that the email was the contract,  and that it could be printed out and signed by both Parties "if you want." *See* Plaintiffs' Exhibit B.

Plaintiffs complained of serious problems beginning soon after the project started. Defendant's employees had begun by digging two large pits on diagonal corners of the house to provide access to the foundation for equipment. These pits filled with water, including water coming from the downspouts on the house. The Defendant attempted to address the water issue by installing pumps and running corrugated drain pipes to a creek on the Property, but with limited success. Standing water remained a problem throughout the project. The excavation also created a "wind tunnel" effect under the house during the initial cold winter months. Water pipes froze and disrupted the Plaintiff's water supply, forcing them to go to a relative's house and to truck in water. Water that continued to infiltrate under the house during the project disabled the furnace which was located in the crawl space. The Plaintiffs were forced to rely on a wood stove as their sole source for heat, which was inadequate to heat the entire house and forced them to sleep in the living room during cold weather.

The project continued on for many months with apparently little positive progress being made. The Plaintiffs complained to the Defendant about the problems noted above, as well as other matters, such as excavation debris piles left all over the property rendering much of it unuseable, but the Defendant was largely unresponsive. As October arrived with no end in sight the Plaintiffs became concerned about the possibility that they would be going through another winter with the same heating and water problems they had experienced during the first several months of the project. On October 26, 2018 Plaintiff Jessica Poutous sent a long email to the Defendant recounting the continuing water problems on the Property, asking when french drains would be installed and downspouts rerouted, and commenting that the nights were beginning to go below freezing which threatened to burst water pipes because the house still could not be heated.

5

The Parties thereafter discussed the situation and it was agreed that the project should be put on hold for the winter and resumed in the spring. Plaintiff Jesse Blake purchased some gravel to place around the still-exposed foundation of the house and used 2x4 framing, OSB and plastic sheeting to construct a barrier on an open portion of the foundation, hoping thereby to keep wind and water from entering under the house.[5] The project was "closed off" for the winter on November 14, 2018 – nearly 10 months after the start date. The winterization efforts did provide some relief, but the Plaintiffs still experienced similar problems in the winter of 2018 -2019 as they had in the initial winter months of the project in early 2018. Sometime during the time period of December 2018 to February 2019 Plaintiff Jessica Poutous was at home and heard a loud noise on the north side of the house which proved to be a partial collapse of one of the foundation walls that had been constructed by the Defendant.

Having lost faith in the Defendant's ability to complete the project, the Plaintiffs started to look for another contractor to take over and they spoke with Leicher Construction, LLC about repairing the Property. The owner of that company, Carl Leicher, first visited the Property in March 2019 and at that time he personally observed 4 to 5 feet of standing water under the house. Leicher testified that he instructed Plaintiff Jesse Blake not to go under the house because it was dangerous and could collapse. Since it would be a challenge to repair the Property from the

---

[5]

It should be noted that Plaintiff Jesse Blake did so in his capacity as an independent contractor working for the Defendant. He had submitted an employment application to the Defendant in June 2018 and was hired by the Defendant. He was assigned to work primarily on other work projects of the Defendant, but was occasionally assigned to work on the project on his own house as well. The Defendant sought to make much of this situation at trial, but the Court fails to see the relevance of it. There was no evidence that any work on the Property that was performed by Jesse Blake was the cause of any of the problems being experienced.

6

condition it was then in, and since water was such a big part of the problem, Leicher thought it would make more sense to wait until later in the year to begin work on the Property. Plaintiffs sent a letter to the Defendant in May 2019 terminating their contract with him.

Leicher submitted a proposal to the Plaintiffs on July 12, 2019, for the work he believed was necessary to remedy the situation – work which included removal of the block walls that had been installed by the Defendant. He informed the Plaintiffs that the work would take approximately 6 to 8 weeks to complete. The Plaintiffs agreed to the proposal and Leicher began work on August 15, 2019. The first steps taken by him were to alleviate the water problems at the site and remove piles of debris and some trees to allow better access to the house for the necessary work. Leicher testified that none of the work done by Defendant was salvageable; it all had to be removed.[6] After the work that had been done by the Defendant was removed a basement with new footer was completed and a new furnace was installed. Leicher finished all of the work by mid-October 2019. The Plaintiffs now have a full basement and have had no further water problems. The Parties stipulated that the Plaintiffs paid Leicher approximately $189,500 for the work that he did. *See Parties' Joint Stipulation of Facts*, Doc. No. 74, at ¶6.

The Parties have also stipulated to the Defendant's work records for the project. *See Id.* at ¶12 and Attachment. The Court itself reviewed the Defendant's work records and they show

---

[6]
    For instance, Leicher testified that when he was first at the Property his view of some of the work that had been done by the Defendant was obstructed by water and mud. After he started the project and water was removed, enabling him to better see what had been done, he found that the footer which the Defendant had installed had to be completely removed and redone because it was not set deep enough and was not on a sufficient base. Leicher ended up having to dig roughly 18 inches deeper and construct a new footer.

Case 20-02196-TPA   Doc 90   Filed 06/02/22   Entered 06/02/22 16:20:01   Desc Main
Document      Page 8 of 26

that between the start date of January 24, 2018 and the "closed for winter" date of November 14,

2018 – a  total of 294 days, or 42 weeks – agents of the Defendant were on the job site on 71 days,

which works out to less than 2 days per week.  The records indicate many "pauses" in the work,

some indicated to be due to weather, and  others unexplained.  The records also show that in most

instances 2 or 3 employees were present on work days.  Very little work appears to have been done

on the project from early-September on, with only a few days where anyone other than the

Defendant or Plaintiff Jesse Blake were at the Property.

            While the trial testimony as to the conditions on the Property were helpful, the best

evidence came from photographs and videos showing the Property.  These were quite striking and

demonstrated the poor workmanship involved here.  Several photographs of one of the foundation

walls constructed by the Defendant taken in July 2018 show a corner block visibly out of line by at

least an inch.[7] The videos were taken in  2019 and the credible  testimony of Plaintiffs was to the

effect that they accurately showed the condition of the Property as left by the Defendant because

no changes were   made by the Plaintiffs between the closure of the property in the previous

November and the dates the videos were taken.

            One video (Ex. D-128) shows a huge open pit with standing water right next to the

house.  Another video (D-129) shows the underside of the house, best described as a pit under the

---

[7]

    Under questioning by his own attorney, the Defendant testified that he could have completed
the project in 2019 if Plaintiffs had not terminated the contract.  When asked the follow-up question
of how he would have done that, Defendant answered "well, by that time I would hopefully had
more people in place that were better masons, or more masons, masters, that I was in the process of
trying to get together for that ... " *See Audio Transcript of Trial* at 4:121:55 to 4:12:08.  In the
Court's view of the manner, context and tenor in which the comment was delivered, such a statement
was tantamount to admitting that the people who had worked on the foundation walls in 2018 were
not competent masons.

8

house with deep standing water. Dripping water can be heard and particles can be seen floating through the air which were testified to be mold spores and dust. A poorly-constructed partial wall can be seen. A third video (D-130) was taken during a rainstorm and shows a length of plastic pipe inserted into a gutter on the house, apparently in an effort to collect and divert rainwater away from the house, but with little effect as water can be seen pouring from the gutter into a pit around the foundation of the house. A final video (D-131) shows a portion of the house which the parties referred to as "the library" unsupported by any of the foundation wall constructed by the Defendant. A wall which was constructed does not appear to have been sealed or waterproofed. Windows in a foundation wall were installed vertically rather than horizontally as would have been proper. Although it is not raining in the video, a downspout that is shown would drain directly into the area next to the foundation because there is no drainage pipe to lead the water away.

The Plaintiffs contend that any debt owed to them by Defendant arising from the Parties' contract is excepted from discharge pursuant to *11 U.S.C. §§523(a)(2)(A)* and *523(a)(6)*. Before turning to those Bankruptcy Code Sections however, the Court should note that the amount of the debt, if any, is unknown at this time. The Plaintiffs initiated a lawsuit against the Defendant in a state court proceeding but it was stayed by the bankruptcy filing and remains pending. The Plaintiffs have not filed a proof of claim in the bankruptcy. The Court in this *Memorandum Opinion* makes no finding with respect to the amount of any debt that the Defendant may owe to the Plaintiffs from the events as described herein.[8]

---

[8]

In many instances where a non-dischargeability adversary proceeding is filed the amount of the debt is not in dispute either because it is the subject of a liquidated pre-petition judgement, or is listed as an undisputed debt in the debtor's Schedules, or is set forth in a proof of claim to which no objection has been filed. In the present case, by contrast, no pre-petition judgment was entered,

### *DISCUSSION*

### *(i)   Count I – False pretenses, false representation, actual fraud*

*Section 523(a)(2)(A)* excepts from discharge any debt "for money, property, services... to the extent obtained by ... false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's ... financial condition." Plaintiffs contend that the Defendant misrepresented that he had the necessary equipment, personnel, financial resources, and experience to timely and properly complete the project within the approximate 6 week time frame for the project. It can immediately be seen that any contention that the Defendant misrepresented

---

the Debtors list a $50,000 unsecured claim by Jesse Blake (but not Jessica Potous) in their Schedule E/F but show it as "disputed," and no proof of claim has been filed by the Plaintiffs. There was evidence at trial to show that the Plaintiffs paid the Defendant $67,500. At first blush that would appear to be the amount of the nondischargeable debt but in Paragraph 51 of the Amended Complaint the Plaintiffs allege that they "have and continue to incur damages in the amount in excess of $67,500." *See* Doc. No. 34. No evidence was provided at trial by either side that would help clarify the proper amount of the debt, if any. Furthermore, the Court was provided with no evidence as to exactly what claims or counterclaims may be pending in the pre-petition state court action that was stayed by the bankruptcy filing, the final result of which may conceivably increase or reduce the $67,500 figure.

A bankruptcy court does have the power to enter a monetary judgment as part of a nondischargeability action, but is not required to do so. *See, e.g., In re Bath*, 442 B.R. 377, 398-99 (Bankr. E.D. Pa.. 2010) ("A bankruptcy court has the jurisdiction to enter a money judgment for a claim found to be excepted from discharge .... But that jurisdiction is exercised in the court's discretion and the court may opt to simply determine that a debt is nondischargeable without determining or entering a money judgment in a specific amount." quoting *In re Buckley*, 2009 WL 400628 (Bankr.C.D.Ill.2009)), *In re Bell*, 498 B.R. 463, 484 (Bankr. E.D. Pa. 2013) ("...the question whether the amount of a nondischargeable debt should be liquidated and reduced to judgment by the bankruptcy court is left to the court's discretion.") In the present case, because of the uncertainty surrounding the exact nature of the dispute between the Plaintiffs and the Defendant as set forth in the state action, and the conflicting positions as to the amount of any debt, the Court chooses to make a finding of nondischargeability without exercising its jurisdiction to determine an amount, leaving that for the state court or elsewhere. *Accord, In re Chan*, 2008 WL 5428271, at *21–22 (Bankr.E.D.Pa.2008).

10

his financial resources is tantamount to a misrepresentation as to his financial condition.  Such

contention  thus  falls outside the scope of *Section 523(a)(2)(A)* and will not be considered further

herein.[9]

The exceptions to discharge set forth in *11 U.S.C §523(a)* are strictly construed

against creditors and liberally construed in favor of debtors in furtherance of the "fresh start" policy

of the Bankruptcy Code. *In re Cohn*, 54  F.3d 1108, 1113 (3d Cir. 1995).  Creditors bear the burden

of proof by a preponderance of evidence under *Section 523(a)(2)(A).  See In re Pearsall*, 2016 WL

3976479, at *6 (Bankr. W.D. Pa. July 19, 2016).

The distinction between a false representation and a false pretense under *Section

523(a)(2)(A)* is that the former is an express statement whereas the latter is an implied

misrepresentation or a product of conduct by the debtor that fostered a false impression.  *Id*. (citing

cases).  Or, as another court stated:

> A claim of false pretenses is a variation on a claim for false
> representation. False pretenses requires a "proof of an implied
> misrepresentation promoted knowingly and willingly that creates a
> misleading understanding of the transaction by the [creditor]." In re
> Aug., 448 B.R. at 349–50. In other words, a false pretense is an
> implied misrepresentation or conduct which "creates and fosters a
> false impression" compared to an express misrepresentation. Id.

*In re Witmer*, 541 B.R. 769, 778 (Bankr. M.D. Pa. 2015).  *See also, In re Antonious*, 358 B.R. 172,

182 (Bankr. E.D. Pa. 2006) (False pretense has been defined as any series of events, when

---

[9]

Misrepresentations as to financial condition are separately addressed in *11 U.S.C.
§523(a)(2)(B)*, a provision not at issue in this case.

considered collectively, that create a contrived and misleading understanding of a transaction, in which a creditor is wrongly induced to extend money or property to the debtor).

The Court finds that the Plaintiffs have presented no evidence of any express statement made by the Defendant that could serve as a false representation. They did attempt to establish that the Defendant had expressly stated that he would complete the project in approximately 6 weeks, but that was based only on the payment schedule as set forth in the January 22nd email from the Defendant which had the second and third payments spaced at two week intervals following the initial payment, with the fourth and final payment then due "upon completion." Plaintiffs testified that they inferred from this payment schedule that the project would be completed in about 6 weeks, though they acknowledged that the Defendant never expressly stated so, and they never insisted that a 6 week completion date be added to the contract. In short, Plaintiffs' *Section 523(a)(2)(A)* claim fails insofar as it is based on any alleged false representation by the Defendant.

Thus, the issue comes down to whether Plaintiffs have proven that the Defendant engaged in a false pretense in connection with the formation of the contract.[10] The elements which the Plaintiffs must prove to establish that they entered into the contract with defendant and paid him

---

[10]
Some courts have found that omissions to state a material fact can constitute representations for purposes of *Section 523(a)(2)(A)*, especially where the circumstances of the case create a false impression which is known by the debtor. *See e.g., In re Booker*, 165 B.R. 164, 169 (Bankr. M.D.N.C.1994). The Court could thus potentially analyze the Defendant's failure to disclose his lack of relevant experience as an express misrepresentation by omission. However, it has been noted that the differences between a misrepresentation by omission and a false pretense are minimal. *In re Milliron*, 2021 WL 4515239, at *8 (Bankr. D. Alaska Sept. 30, 2021). For the sake of clarity the Court therefore chooses to look solely to the false pretense prong of the statute.

money are that:

> (1)  there was an omission or implied misrepresentation; (2) promoted knowingly and willingly by the debtor; (3) creating a contrived and misleading understanding of the transaction on the part of the plaintiff; and (4) which wrongfully induced the plaintiff to advance money, property or credit to the debtor.

*In re Pfender*, 2022 WL 696947, at *6 (Bankr. E.D. Pa. Mar. 8, 2022).  Plaintiffs must also show that the defendant was acting with a fraudulent intent at the relevant time. *Id*. As will be discussed below, the Court finds that Plaintiffs have met their burden.

The Defendant responded to the Plaintiffs' RFP not simply by suggesting the installation of a drainage system within the existing crawlspace, as did the other responding contractors, but rather by the far more elaborate suggestion of converting the existing crawlspace under the house  into a full basement, while also addressing the water problem that had triggered the RFP.  The Defendant himself acknowledged at trial that what he was proposing was a "complex project."

In the Court's view, by the very act of making such a proposal, far beyond merely addressing the crawlspace water problem as had been requested in the RFP, the Defendant  can be said to have impliedly represented to the Plaintiffs that he had the experience, know-how and ability to competently perform the extensive and complicated work that would be necessary to carry it out, and to do so within a reasonable period of time.

Despite this implicit representation being made by the Defendant,  there was little in his personal background at the time to indicate he could actually do the job he had proposed.

13

Defendant's business at the time consisted of painting and small handyman-type jobs.   The demolition of a crawl space and construction of a basement under an existing house coupled with the accompanying issue of an ongoing water problem, represented a quantum leap from any project the Defendant's business had done up to that time.   As to prior, similar experiences, he testified that he had previously only once been involved in a full basement renovation, but that was 14 years earlier and only in the role of a laborer who was learning masonry – in other words as  a minor player with no oversight responsibility.   The Debtor never informed the Plaintiffs about this paucity of experience in  performing  the sort of work he was proposing.

The actual objective facts then existing at the time of the formation of the contract, unknown to the Plaintiffs, and contrary to the implied representation made by the Defendant, were such that Defendant's  ability to perform the contract in a timely and workmanlike manner was questionable at best.   The predictive accuracy of those facts was borne out by subsequent events. The credible testimony of the Plaintiffs, Leicher, and the photographic  and video evidence demonstrated that the Property was left in an appalling  condition  after some 9 months of work by the Defendant.   Significantly, in the aggregate, they lead the Court to the inescapable conclusion that the Debtor was simply not capable of performing this contract despite his implied misrepresentation to the contrary.

The Debtor argued that the reason for the abysmal failure of the project was not his inability to perform, but rather unforeseen circumstances that were beyond his control.   The Debtor pointed to the "water table" and "water and muckiness" as the reason why the project could not be completed.   The Court does not accept that argument for two main reasons.   First, it does not explain

14

how another contractor, Leicher, was able to satisfactorily and timely complete the project in the

following year.   Second, the Court has serious concerns about the overall credibility of the

Defendant's testimony.

As to the first of these reasons, a  key piece of evidence presented by Plaintiffs  was

the testimony of Leicher, who was hired by them to rectify the situation left by the Defendant.

Leicher was a credible witness with considerable experience in just the sort of work that was

involved in this project.  Several things in his  testimony stand out.  One is that none of the work that

was done by the Defendant was useable by Leicher.  It all had to be removed and redone.  If, as the

Defendant would have it,  the only problem was that his work on the project had been slowed down

by circumstances beyond his control, then it would seem that at least the work that had been

completed before the contract was terminated could still have been used by Leicher.   The fact that

none of it could be used bespeaks a fundamental issue of competency. Another point is that Leicher

was apparently able to quickly correct the water problem that had plagued the project the entire time

that the Defendant had been on the job and thereafter.  He did so by pumping out the standing water

and taking steps to prevent the water from reentering the work site.  By all indications Leicher was

able to then quickly begin work on the project and make rapid progress, unlike the Defendant.

Finally,  and notwithstanding that he also had to do extra work to remediate the problems left by the

Defendant, Leicher was able to complete the job to the full satisfaction of the Plaintiffs in

approximately 2 months whereas Defendant was on the job for more than 9 months and left the

Property in a deplorable condition.   These facts starkly demonstrate to the Court the difference

between a contractor that was capable of performing  the contract and one who was not able to do

so, but through false pretense represented that he was.[11]

The Court also rejects the Defendant's excuse for the project failure because of concerns it has about the overall credibility of the Defendant's testimony at trial. A couple of examples will demonstrate the reason for such concern. The Plaintiffs testified that after work on the Property by the Defendant was stopped in late-fall 2018 and the Property was winterized they did nothing further on the Property until Leicher started his work the following August. The Plaintiffs explained that they did not have the expertise or equipment to try to change anything, and they credibly testified that the condition of the Property as shown in the videos taken in 2019 was as the Defendant had left it. The Defendant, however, denied that assertion, testifying that he had installed drain lines that were not visible in the exhibit videos – clearly suggesting that the Plaintiffs had removed them after the winterization was done and thus exacerbated the condition of the Property. But there would have been no reason for the Plaintiffs to do something like that and cause further damage their own property. The Court does not believe they did so.

---

[11]

Though by no means dispositive, it is at least instructive to compare the weather records for the years 2018 and 2019 to see if they support the Defendant's argument that the existence of circumstances beyond his control is what caused the project failure under his watch. Official weather records for Pittsburgh, Pennsylvania, the closest National Weather Service office to the Property, show that 2018 was indeed a wet year, with 57.83 inches of rain (vs. a normal of 40.93 inches), but 2019 was not far behind it with 52.46 inches. (Reference accessed at https://www.weather.gov/wrh/climate?wfo=pbz). Furthermore, focusing more closely on the August through October months when Leicher was actually on the job as opposed to the entire year, the totals were 16.62 inches in 2018 and 15.04 inches for 2019, so again not a huge difference. Weather therefore seems to be an unlikely candidate to explain why the Defendant failed to complete the project while Leicher succeeded. For a court's authority to take judicial notice of official weather records *see, e.g., Easy Sportswear, Inc. v. Am. Econ. Ins. Co.*, 2008 WL 2682689, at *1 (W.D. Pa. July 1, 2008) and *Corner Pocket, Inc. v. Travelers Ins.*, 2013 WL 4766293, at *2 (W.D. Pa. Sept. 4, 2013).

At another point in his testimony the Defendant recounted an inspection of the Property that had occurred sometime after Leicher had completed the project and apparently after the Plaintiffs had filed the state court suit against him. The Defendant claimed that he had personally observed water "pouring through" one of the walls that Leicher had constructed. There was, however, no other evidence of such an event and that assertion was flatly contradicted by the testimony from the Plaintiffs in that they were very satisfied with Leicher's work, that they have had no further water problems since he completed the new basement, and that they paid him in full for his services. The Defendant's testimony to the contrary on this point is not credible and further taints his entire testimony in the Court's view.

This Court, as the finder of fact, is "best positioned to assess the facts, particularly those related to credibility and purpose." *In re Myers*, 491 F.3d 120, 126 (3d Cir. 2007). This Court has previously explained the "strategies" it uses to assist in making credibility determinations. *See In re Pearsall*, 2016 WL 3976479 *1 (Bankr. W.D. Pa., July 19, 2016). As applicable here, that would include: (1) an observation, beyond mere words, of the deportment, demeanor and attitude of the witness; and, (2) an examination of the inherent probability, or lack of probability, of the particular facts propounded by the witness considered in the light of all the facts and circumstances in the record, applying ordinary common knowledge of human nature and common sense as the measure of probability.

When the Court employs these various strategies in the present case the Defendant's credibility came across as poor. In addition to the perceived falsehoods in his testimony as described above, the Defendant's demeanor and attitude did not inspire confidence in his overall

17

credibility. The Defendant was quick to blame everyone but himself for the obvious failure of the

project. Jessica Poutous was blamed for purportedly giving the Defendant faulty information as to

the water table level on the Property. Jesse Blake was blamed for not doing more to "winterize" and

maintain the Property after work was temporarily shut down in November 2018, and for

subsequently "poaching" workers from the Defendant. Other workers of the Defendant were blamed

for not showing up or otherwise being unavailable. The weather was blamed for making the work

impossible, the Defendant was not given enough time to complete the project and could have

completed it had he been allowed to work on it in 2019,[12] etc. In the Court's view, this lack of any

accountability by the Defendant despite his status as the construction professional who had proposed

the project in the first place, and who was the person with ultimate responsibility for it, significantly

undermined his credibility.

     The extensive "blame game" engaged in by the Defendant also falters because the

totality of facts and circumstances simply do not support the probability of it being an accurate

reflection of what really caused the project to fail. As discussed elsewhere in this *Memorandum

Opinion*, the Court had the benefit of the Leicher testimony which clearly established to the Court's

satisfaction that a qualified and competent contractor would have had no difficulty in satisfactorily

performing the work that was the subject of the contract between the Plaintiffs and the Defendant

in a timely manner. The Defendant's deflections and assertions to the contrary thus ring hollow,

---

[12]

     In connection with the Defendant's insistence that he would have been able to complete the
project had he only been permitted to work on it in 2019 it is worth reiterating that Plaintiffs did not
terminate the contract until May 2019. The Defendant therefore had time to resume work on the
project  after the winter of 2018-19, but before the contract was terminated, yet there was no
evidence presented to show that he ever even attempted to do so.

diminish his credibility, and as a result further bolster the Court's conclusion that false pretenses were involved in and at the time of the creation of the contract on the Property.

The Court therefore finds that the Defendant failed to perform under the contract because he lacked the ability to perform and engaged in a false pretense by indicating otherwise to the Plaintiffs. As to the exact reason or reasons for the Defendant's inability to perform, that is more difficult to say. In addition to a fundamental lack of the necessary experience to do so on the part of the Defendant, the Plaintiffs have also pointed to his lack of the required personnel for the work and his lack of proper equipment for the job. The Court suspects that all of these factors played some role in the Defendant's failure to perform, though it is not necessary to try to make some sort of allocation in that regard as they all go to his overall ability to perform which was the basic subject of the implied misrepresentation that the Court has found was made at the time he proposed the complex basement project to the Plaintiffs without disclosing his lack of relevant expertise and experience.

A false pretense as to the expertise or qualification to perform a contract can constitute a false pretense for purposes of *Section 523(a)(2)(A)*. *See, e.g., In re Bozzano*, 173 B.R. 990, 994–95 (Bankr. M.D.N.C. 1994), abrogated on other grounds by *Cohen v. de la Cruz*, 523 U.S. 213 (1998) ("In short, the evidence established that Bozzano knowingly made statements and engaged in conduct that created a false impression regarding his qualifications and abilities as a general contractor and regarding the quality of the house. Notwithstanding, he said and did nothing to correct the false impressions that he had created, under circumstances in which he must have known that the plaintiffs were acting in reliance on the false impressions. Such conduct on the part

19

of Bozzano constituted false representations and false pretenses within the meaning of §523(a)(2)(A).”),  *In re Carpenter*, 453 B.R. 1, 6 (Bankr. D.D.C. 2011) (“When a creditor establishes that a debtor fraudulently induced the creditor to enter into a transaction by a misrepresentation that goes to the essence of the transaction, i.e., a debtor's training, competency or experience to complete the work contemplated by the transaction, the misrepresentation was a substantial factor in entering into the transaction, the debtor's work later appears defective, and the creditor suffers a loss, the creditor has established a prima facie case that the defects derive directly from the lack of professional qualifications of the debtor.”), *In re Sevastakis*, 591 B.R. 197, 203 (Bankr. D.N.J. 2018)(“In cases involving a debtor-contractor ... courts in [the 3rd] Circuit have generally recognized “two ways to establish misrepresentation or fraud under section 523(a)(2)(A): (1) to show that the contractor executed the contract never intending to comply with its terms, or (2) to demonstrate that the contractor intentionally misrepresented a material fact or qualification when soliciting the work.”).   Here, the Plaintiffs clearly met this burden of persuasion, i.e., that the Defendant intentionally misrepresented his ability to complete the project by false pretense thereby shifting the burden of persuasion to the Defendant to show otherwise.  The Defendant failed to meet his burden in this regard. *See e.g., In Re Williams,* 579 B.R. 314, 323 (S.D. N.Y. 2016) (creditor has burden of proof by a preponderance of evidence; if creditor establishes a prima facie case under *Section 523(a)(2)(A)* the burden shifts to the debtor to present a defense).

The Court acknowledges that in most cases of this type the debtor-contractor has made an express representation to the creditor who is seeking a finding of nondischargeability.  *See, e.g.,   In re Pleasants,* 219 F.3d 372 (4th Cir. 2000) (debtor misrepresented his status as an architect to homeowners), *In re Fuselier*, 211 B.R. 540 (Bankr. W.D. La, 1997) (debtor misrepresented that

he held a contractor's license), and *In re Carpenter*, 453 B.R. 1 (Bankr. D.C. 2011) (debtor falsely

represented that he held a license to perform home improvement work in the District of Columbia).

Despite that, the Court sees no reason why a finding of nondischargeability cannot also be made on

the basis of a false pretense rather than an express representation if the circumstances are such that

someone in the position of the creditor could have rightfully assumed that the conduct of the debtor

implied a representation of a specific ability to do certain work.

The Court finds such circumstances to exist here where the Defendant, going far

beyond what the Plaintiffs originally had in mind, proposed the complex task of constructing a

basement under their existing house, while also dealing with an ongoing water problem and the

Defendant clearly not possessing the ability to complete the project at the time the contract was

entered. The old adage that "the proof is in the pudding" would seem to best capture the Court's

thought process in this regard. The fact that contractor "B" was able to successfully complete a

project in 2 months whereas contractor "A" was unable to do so in almost 10 months, with all the

other factors being essentially equal, is strong evidence that contractor "A" lacked the competence

necessary to do the work.

As a result of all the foregoing, the Court finds that the Defendant engaged in an

implied misrepresentation or omission, and thus a  false pretense under *Section 523(a)(2)(A)*, when

he proposed to the Plaintiffs a contract that, in view of all the evidence, was obviously beyond his

expertise and ability without apprising Plaintiffs of his questionable ability to perform such contract,

thereby securing the contract and obtaining payments from the Plaintiffs. The Court further finds

that the misrepresentation was promoted knowingly and willingly by the Defendant at the time of

21

the contract was entered. The Defendant undoubtedly knew that there was likely to be competition from other contractors since he was responding to an RFP that had been placed on a public site on the internet. By making the proposal he did the Defendant offered something to Plaintiffs beyond a simple remedy to the water problem they were experiencing and thereby gained an advantage over such competitors.

Furthermore, the Defendant's implied misrepresentation or omission created a contrived and misleading understanding of the transaction on the part of the Plaintiffs. By raising the enticing prospect of providing a full basement to the Plaintiffs, in addition to solving their water problem, the Defendant misled them into thinking they were contracting with someone who had the experience and ability to carry out such a complex project. The Court also finds that by making the implied misrepresentation or omission the Defendant wrongfully induced the Plaintiffs into accepting the contract and making payments under it to him. Consider, for example, what would have  happened if the Defendant had shown up at the Property in response to the RFP, and after making his proposal had stated:  "I should inform you that I have never done a project of this scope before, but I did work as a laborer on a basement renovation project in 2004." Based on the tenor of their testimony it is highly unlikely that the Plaintiffs would have readily agreed to enter into the contract under those circumstances without first asking a number of additional questions and otherwise seeking assurances that the Defendant could actually do what he was proposing.

The evidence clearly supports a finding that the Defendant engaged in the implied misrepresentation  or omission with the intent and purpose of deceiving the Plaintiffs. The Defendant denied having any intention to harm the Plaintiffs, and that may well be true, but the

question is not whether he intended to harm them, but rather whether he intended to deceive them.
*See In re Cozart*, 417 B.R. 116, 127–28 (Bankr. W.D. Ark. 2009) (the intent element of *Section
523(a)(2)(A)* does not require a finding of malevolence or personal ill-will; all it requires is a
showing of an intent to induce the creditor to rely and act on the misrepresentations in question.).
Direct evidence of an intent to deceive is rare, so courts have found that it can be done by showing,
by a totality of the circumstances, reckless indifference or reckless disregard of the accuracy of the
information provided. *See In re Bocchino*, 794 F.3d 376, 382 (3d Cir. 2015) ("A debtor will rarely
admit to intentional deception, thus intent is most often inferred from the totality of the
circumstances"). Here, by knowingly, or at the very least recklessly, engaging in a false pretense that
would lead the Plaintiffs to believe that he was capable of undertaking the project he had proposed
to them, the Court finds that the Defendant was intending to deceive them and thereby gain a
contract.

Finally, the Court finds that the Plaintiffs justifiably relied on the Debtor's false
representation in that they believed they were dealing with a reputable contractor and had no reason
to question his ability to perform the work he had proposed. Finally, the Court finds that the
Plaintiffs were proximately harmed by the false pretense employed by the Defendant. They are out
the substantial sum that they paid to the Defendant ($67,500 consisting of 3 payments of $22,500
each) with nothing to show for it in return. They also suffered the positive harm of being forced to
live over two winters with the heating and water problems that were described previously, as well
as to lose the use of the Property in many respects for over a year and a half.

In light of all the foregoing, the Court is satisfied that the necessary elements for a finding of nondischargeability due to false pretenses under *Section 523(a)(2)(A)* have been proven by Plaintiffs. *See Pearsall, supra; Pfender, supra*; *In re Oakley*, 503 B.R. 407 (Bankr. E.D. Pa. 2013).

### (ii) *Count III – Wilful and malicious injury*

*Section 523(a)(6)* excepts from discharge a debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." The allegations in Count III of the Amended Complaint as to what the Defendant or his employees did to constitute a willful and malicious injury are vague. Aside from incorporating by reference the allegations from Count I as to false pretenses, false representation, or actual fraud under *Section 523(a)(2)(A)*, the relevant paragraphs in Count III only state:

> 62.  Upon obtaining payment from Plaintiffs, Wolfe proceeded to intentionally and severely damage Plaintiffs' home and property.
>
> 63.  Rather than repair incorrectly installed structures, Wolfe abandoned the Project in a dangerous state of disarray leaving Plaintiffs' home in a structurally unsound condition while retaining $67,500 of the Plaintiffs' money.

Doc. No. 30 at ¶¶62, 63. In its September 17, 2021 Order granting the Defendant's *Motion to Dismiss* in part, the Court noted that these two paragraphs were little more than conclusions, and it made clear that, even though Count III partially survived the *Motion to Dismiss*, the Plaintiffs faced a significant burden at trial to establish a willful and malicious injury. Based on the standard

24

required to prove a willful and malicious injury under *Section 523(a)(6)* as established in

*Kawaauhau v. Geiger*, 523 U.S. 57 (1998), the  Court in its September 17th Order stated:

> In the present case, taking the allegations about the Debtor's implied
> representation as to his capability to perform the contract in a light
> most favorable to the plaintiffs, as it must for purposes of the Motion,
> the Court concludes that it is at least possible that the Plaintiffs could
> prevail on Count III.  As with Count I, this will not be easy.  The
> Plaintiffs will have to show that the Debtor in making the
> representation knew that it was certain, or substantially certain, that
> he would not be able to timely and properly complete the project, and
> that Plaintiffs would be injured as a result, as well as that he was
> acting maliciously in making the representation.

Doc. No. 46 at p. 8.

The Plaintiffs having now been given an opportunity at trial to prove their case as to

*Section 523(a)(6)* under Count III, the Court concludes that they have failed to do so.  There was no

evidence presented at trial tending to show that the Defendant was certain or substantially certain that

he would not be able to timely and properly complete the project and that the Plaintiffs would be

injured as a result.  While the Defendant engaged in false pretenses at the time of entering the

contract concerning his capabilities, as concluded above by the Court, that of itself does not equate

to a willful and malicious injury for purposes of *Section 523(a)(6)*.  It is possible for a person to

secure a contract through false pretenses while at the same time believing he will be able to perform

under the contract, and with no intent to injure the other party.  It was the Plaintiffs' burden to show

otherwise with respect to the Defendant and they failed to do so.

Plaintiffs also failed to provide any evidence which could move Paragraph 62 of their

Amended Complaint beyond being a bare conclusion.  There was no evidence of any intentional harm

to the Property done by the Defendant or his employees.  Likewise, no evidence was presented which could support the "abandonment" contention of Paragraph 63 of the Amended Complaint.  The evidence established that it was the Plaintiffs who raised the possibility of shutting down the project for the winter of 2018-2019, and they who then terminated the agreement with the Defendant.  The Court does not question the wisdom or appropriateness of their doing so given the Defendant's poor performance, but it cannot be said that the Defendant abandoned the project so as to establish a willful and malicious injury under *Section 523(a)(6)*.

## *CONCLUSION*

The Court finds in favor of the Plaintiffs as to Count I and in favor of the Defendant as to Count III.  As a result of this decision any debt owed by the Defendant to the plaintiffs arising out of or related to the contract of January 22, 2018, is excepted from discharge pursuant to *Section 523(a)(2)(A)*.  For the reasons stated above in Footnote 8, this decision does not determine whether any such debt actually exists, and if so in what amount.  An appropriate order follows.

Dated: June 2, 2022

Thomas P. Agresti, Judge
United States Bankruptcy Court

Case Administrator to serve:
    Jason R. Johns, Esq.
    Samuel R. Grego, Esq.
    Brian Farrington, Esq.
        Charlton & Charlton
        617 S. Pike Road
        Sarver, Pennsylvania 16055
    Debtors